UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                )
MAURISA DOS SANTOS MOURA,        )
                                )
            Petitioner,          )
                                )
      v.                         )        CIVIL ACTION
                                )        NO. 1:13-cv-12831-WGY
CHRISTINE SILVA CUNHA,           )
                                )
            Respondent.          )
                                )
_____


_____
                                )
PATRICK BRENDAN GALLAGHER,       )
                                )
            Petitioner,          )
                                )
      v.                         )        CIVIL ACTION
                                )        NO. 1:13-cv-12805-WGY
MARY DORIS GALLAGHER,            )
                                )
            Respondent.          )
                                )
_____
```

RULINGS OF LAW

YOUNG, D.J.                                    December 22, 2014

## I.   INTRODUCTION

This opinion addresses two different cases under the Hague
Convention on the Civil Aspects of International Child Abduction
(the "Hague Convention" or "Convention").  The two cases dealt
with fairly different situations.  In the first, the child was
not abducted from her country of residence by one of the
parents.  Rather, the mother allowed a friend – allegedly, the

child's godmother – to bring the child from Brazil, her country
of residence, to the United States.  After the child's
authorization to travel had expired, the purported godmother
refused to take the child back to Brazil, despite the mother's
attempts to have her back.  Finally, the mother decided to
pursue the return of the child to Brazil under the Hague
Convention before this Court.  In the second case, the mother
brought her children from Ireland to the United States and
failed to return to Ireland on the round trip tickets' return
date.  The father then pursued the return of the children to
Ireland under the Hague Convention before this Court.  In both
cases, but for different reasons, this Court ordered the return
of the children to their country of residence.  Considered
together, the two cases provide a broad overview of the
Convention's framework and warrant a considered discussion. This
opinion, therefore, constitutes the Court's more expanded
rulings of law as contemplated by Fed. R. Civ. P. 52.

## II.  BACKGROUND

### A.  Moura v. Cunha

Maurisa dos Santos Moura ("Moura") filed her petition
against Christine Silva Cunha ("Cunha") on November 8, 2013.
Verified Compl. & Pet. Return Child ("Moura's Pet."), ECF No. 3.
Moura alleged that Cunha, a friend but not a relative, was
unlawfully keeping Moura's child, Luana Moura ("Luana"), in the

United States. Id. ¶¶ 1, 6. According to Moura, Luana was born in Framingham, Massachusetts in September 2008, but mother and daughter soon relocated and established habitual residence in Brazil, Moura's country of origin. Id. ¶¶ 7-8. In June 2011, Moura granted permission for Luana to travel to the United States in Cunha's company. Id. ¶ 8. Moura reauthorized Cunha to travel with Luana in the United States in March 2012, with that reauthorization expiring on October 20, 2012. Id. Following this expiration date, however, Cunha has continually refused Moura's demand that she return Luana to Brazil. According to Moura, because she "never acquiesced or consented to the retention of [Luana] beyond October 20, 2012 [in] the United States . . . [Cunha]'s retention of [Luana] is wrongful." Id. ¶¶ 12-13. Accordingly, Moura requested this Court to order the return of Luana to Brazil. Id. § VIII.

The case was initially assigned to Judge Tauro, Electr. Notice, Nov. 8, 2013, ECF No. 1, who entered an order allowing Moura's petition to show cause and scheduling a hearing for Cunha to "show cause . . . why [Luana] should not be returned to Brazil." Order, Nov. 20, 2013, ECF No. 11.

On December 3, 2013, the case was reassigned to this Court. Electr. Notice, Dec. 3, 2013, ECF No. 13. Two days later at the show cause hearing, the parties agreed that the case should proceed to trial, which was set for the following week. Electr.

Clerk's Notes, Dec. 5, 2013, ECF No. 16.  At the end of the
trial, this Court entered its findings and rulings from the
bench and ordered the return of Luana "to her mother in Brazil."
Electr. Clerk's Notes, Dec. 12, 2013, ECF No. 18.

### B.    **Gallagher v. Gallagher**

On November 6, 2013, Patrick Brendan Gallagher ("Brendan")
filed a petition requesting the return of his three children to
Ireland, their purported country of habitual residence, after
the children were allegedly wrongfully removed by their mother,
Mary Doris Gallagher ("Mary").  Verified Pet. Return Minor Child
Pet'r ("Brendan's Pet."), ECF No. 1.  In his petition, Brendan
affirmed that he is married to Mary and that the family lived in
Ireland, where both parents exercised custodial rights over the
three children they had together.  Id. ¶¶ 8, 13.  Brendan then
claimed that Mary took the children on a vacation to
Massachusetts on May 19, 2013, to visit family on Cape Cod.  Id.
¶ 15.  Mary and the children were supposed to fly back to
Ireland on August 19, 2013, which never happened.  Id.  Brendan
then stated that Mary filed a petition for custody and a motion
for an emergency hearing in the Massachusetts Probate and Family
Court of Barnstable County; that court allowed the motion and
granted Mary custody of the children.  Id. ¶ 16.

On January 7, 2014, Mary responded to Brendan's petition in
this Court, disputing that Ireland was in fact the children's

country of habitual residence and also that they were wrongfully
removed.  Answer Verified Pet. Return Minor Children Pet'r
("Mary's Answer"), ECF No. 9.  A scheduling conference was held
on January 17, 2014, and a bench trial was set for February 7,
2014.  Electr. Clerk's Notes, Jan. 17, 2014, ECF No. 14.  After
a two-day trial held on February 7 and 10, 2014, this Court
entered its findings and rulings from the bench and ordered the
return of the children to Ireland.  Electr. Clerk's Notes, Feb.
10, 2014, ECF No. 26.

## III. ANALYSIS

### A.    Legal Standard

The Hague Convention, Oct. 24, 1980, T.I.A.S. No. 11,670,
reprinted in 51 Fed. Reg. 10,494 (Mar. 26, 1986) ("Hague
Convention"), incorporated into United States law by 22 U.S.C. §§
9001 et seq., establishes a statutory scheme designed "to secure
the prompt return of children wrongfully removed to or retained
in any Contracting State."  Hague Convention art. 1(a).  A court
adjudicating a dispute under the Convention must make two
inquiries.  The first is a threshold inquiry as to whether the
child was wrongfully removed from the jurisdiction in which he
or she was habitually resident.  If so, this creates a
presumption in favor of return.  The court must then proceed to
the second inquiry, wherein it evaluates whether any exceptions

apply that serve to rebut this presumption.  See id. arts. 12-
13.

## 1.    Threshold Inquiry

Article 3 of the Convention states that:

> The removal or the retention of a child is to be
> considered wrongful where: (a) it is in breach of
> rights of custody attributed to a person . . . under
> the law of the State in which the child was habitually
> resident immediately before the removal or retention;
> and (b) at the time of removal or retention those
> rights were actually exercised . . . or would have
> been so exercised but for the removal or retention.

Id. art. 3.

### a.    Habitual Residence

The first step of the threshold inquiry is the

determination of whether there is a person with a right to

custody under the laws of the country of the child's habitual

residence.  Frequently, this prong of the analysis hinges on

identifying what country meets this standard.  The Convention

does not define "habitual residence," but the First Circuit has

"adopted an approach that begins with the parents' shared intent

or settled purpose regarding their child's residence."  Nicolson

v. Pappalardo, 605 F.3d 100, 104 (1st Cir. 2010); see also

Londono v. Gonzalez, 988 F. Supp. 2d 113, 125 (D. Mass. 2013)

(Saylor, J.) ("[A] child's habitual residence is generally

determined by asking whether the prior place of residence was

effectively abandoned and a new residence established by the

shared actions and intents of the parents coupled with the passage of time.").

While parental intent is a core factor determining residence, it is not the exclusive one, and courts also consider a secondary factor - whether the child has become acclimatized to a new environment. In Gitter v. Gitter, 396 F.3d 124 (2d Cir. 2005), the Second Circuit articulated this test in a formulation that has been broadly followed by other courts:

> First, the court should inquire into the shared intent
> of those entitled to fix the child's residence
> (usually the parents) at the latest time that their
> intent was shared. In making this determination the
> court should look, as always in determining intent, at
> actions as well as declarations. Normally the shared
> intent of the parents should control the habitual
> residence of the child. Second, the court should
> inquire whether the evidence unequivocally points to
> the conclusion that the child has acclimatized to the
> new location and thus has acquired a new habitual
> residence, notwithstanding any conflict with the
> parents' latest shared intent.

Id. at 134; see also Darin v. Olivero-Huffman, 746 F.3d 1, 11-12 (1st Cir. 2014) (noting that objective facts can overcome shared parental intent in determining a child's habitual residence (citing Mozes v. Mozes, 239 F.3d 1067, 1081 (9th Cir. 2001))).

### b. Exercise of Custody

Once a court has determined a child's country of habitual residence, it must evaluate whether the child's removal interfered with the actual exercise of custody of the child by a person given the right to exercise custody by the country in

question.  Hague Convention art. 3.  A person has right of custody over a child if she has "rights relating to [his or her] care and . . . at least a shared right to determine [his or her] place of residence," and a court may find she "would have exercised" her rights if she "persistently sought custody," including petitioning for custody in her country of residence. Kufner v. Kufner, 519 F.3d 33, 39-40 (1st Cir. 2008).

In determining these custodial rights, the court is guided by the Convention's purposes to "restore the pre-removal status quo," and thus the court must "not simply look to the relevant provisions of [the law of the country of residence] but also must interpret those provisions in light of the Convention's basic principle that a child's country of habitual residence is best placed to decide upon questions of custody and access." Whallon v. Lynn, 230 F.3d 450, 455, 456 (1st Cir. 2000).

### 2.  Exceptions

Should a court find as a result of this threshold inquiry that the removal of a child was wrongful, there is a "strong presumption favoring return of a wrongfully removed child," Danaipour v. McLarey, 286 F.3d 1, 13 (1st Cir. 2002), unless certain exceptions apply.

### a. One Year Delay in Filing Plus Well-Settled Child

The first exception to the presumption in favor of return can come into play where (1) more than one year has elapsed between the "date of the wrongful removal or retention" and the "commencement of proceedings in the Contracting State where the child is" located,[1] and (2) "the child is now settled in its new environment." Hague Convention art. 12. The respondent must prove such settlement by a preponderance of the evidence, and the court has discretionary power to determine whether the defense justifies return. See 22 U.S.C. § 9003(e)(2)(B); In re Filipczak, 838 F. Supp. 2d 174, 181 (S.D.N.Y. 2011) ("[I]f more than one year has passed, a demonstration that the child is now settled in its new environment may be a sufficient ground for refusing to order repatriation, but it does not compel the result." (internal quotation marks omitted)).

In making these determinations, most courts have interpreted this evidentiary standard by employing a State Department Legal Analysis issued in conjunction with the adaptation of the Convention, which concluded that "nothing less

---

[1] See Blanc v. Morgan, 721 F. Supp. 2d 749, 762-763 (W.D. Tenn. 2010) ("According to 42 U.S.C. § 11603(f)(3), the phrase 'commencement of proceedings' is defined as the filing of an action pursuant to § 11603(b), which means filing a petition in a court 'authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed,' 42 U.S.C. § 11603(b).").

than substantial evidence of the child's significant connections
to the new country is intended to suffice to meet the
respondent's burden of proof."  Hague Int'l Child Abduction
Convention; Text & Legal Analysis, 51 Fed. Reg. 10,494, 10,509
(Mar. 26, 1986) ("State Dep't Analysis"); see also Lozano v.
Alvarez, 697 F.3d 41, 56 (2d Cir. 2012) (adopting State
Department standard), aff'd in part, 134 S. Ct. 1224 (2014); In
re B. Del C.S.B., 559 F.3d 999, 1003 (9th Cir. 2009) (same).

Furthermore, in determining whether a child is "settled,"
courts consider a series of factors.  The Ninth Circuit, in In
re B. Del C.S.B., has systematized these considerations:

> These factors include: (1) the child's age; (2) the
> stability and duration of the child's residence in the
> new environment; (3) whether the child attends school
> or day care consistently; (4) whether the child has
> friends and relatives in the new area; (5) the child's
> participation in community or extracurricular school
> activities, such as team sports, youth groups, or
> school clubs; and (6) the respondent's employment and
> financial stability.  In some circumstances, we will
> also consider the immigration status of the child and
> the respondent.  In general, this consideration will
> be relevant only if there is an immediate, concrete
> threat of deportation.  Although all of these factors,
> when applicable, may be considered in the "settled"
> analysis, ordinarily the most important is the length
> and stability of the child's residence in the new
> environment.

559 F.3d at 1009; see also, e.g., Habrzyk v. Habrzyk, 775 F.
Supp. 2d 1054, 1066 (N.D. Ill. 2011) (adopting these factors).

Courts also consider the amount of time a child has spent
in the country, as well as their academic performance, social

networks and relationships, and, under some circumstances, country of citizenship. See, e.g., Demaj v. Sakaj, No. 3:09 CV 255(JGM), 2013 WL 1131418, at *18-22 (D. Conn. Mar. 18, 2013) (considering age of the child and stability of the residence, family and friends in new area, attendance at school, religious involvement, and employment history of custodial guardian); In re Lozano, 809 F. Supp. 2d 197, 231 (S.D.N.Y. 2011) aff'd sub nom. Lozano v. Alvarez, 697 F.3d 41 (2d Cir. 2012) ("[T]he child ha[s] been living in one place for sixteen months, which is a long period of time in the life of a five-year-old."); Etienne v. Zuniga, No. C10-5061BHS, 2010 WL 4918791, at *3 (W.D. Wash. Nov. 24, 2010) (considering the fact that child "is of an age and maturity level where he is able to explain his choices and requests," as well as the fact that child has a "significant amount of friends" in the area); Muhlenkamp v. Blizzard, 521 F. Supp. 2d 1140, 1146 (E.D. Wash. 2007) (considering that child is "performing at two to three age levels above her own" and has friends and relatives in the area); Zuker v. Andrews, 2 F. Supp. 2d 134, 141 (D. Mass. 1998) (Collings, M.J.) (emphasizing that the age of the child is a significant factor in whether child is well settled). Courts must also take care, however, to remember that "'well-settled' means more than having a comfortable material existence." Lops v. Lops, 140 F.3d 927, 946 (11th Cir. 1998).

**b.  Grave Risk**

Another exception under the Convention is where "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."  Hague Convention art. 13(b).  The opponent of removal has the burden of proving this risk by clear and convincing evidence.  22 U.S.C. § 9003(e)(2)(A).

This is a high burden, and the First Circuit has held that the "harm must be a great deal more than minimal."  <u>Walsh</u> v. <u>Walsh</u>, 221 F.3d 204, 218 (1st Cir. 2000) (holding that a grave risk could be found when parent to whom child was to be returned was "extremely violent" and had a "clear and long history of spousal abuse," <u>id.</u> at 219-20).  <u>But see</u> <u>Whallon</u>, 230 F.3d at 460 (holding that a grave risk did not exist when parent to whom child would be returned had incidents of verbal abuse and physical shoving toward the spouse, but not a long pattern of abuse).  The Second Circuit has further clarified this standard, stating that:

> [A]t one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation.  The former do not constitute a grave risk of harm under Article 13(b); the latter do.

<u>Blondin</u> v. <u>Dubois</u>, 238 F.3d 153, 162 (2d Cir. 2001). In short, in the absence of clear abuse, courts are unlikely to block removal under this prong. <u>See</u> State Dep't Analysis 10,510 ("An example of an 'intolerable situation' is one in which a custodial parent sexually abuses a child.").

### c.  Consent

Article 13(a) states in relevant part that the Court "is not bound to order the return of the child if the [parent] . . . which opposes its return establishes that the [other parent] . . . had consented to or subsequently acquiesced in the removal or retention." Hague Convention art. 13(a). This article presents two related but separate possibilities: consent and later acquiescence. "Although analytically distinct, the defenses of consent and acquiescence under article 13(a) of the Hague Convention are both narrow. The consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention." <u>Baxter</u> v. <u>Baxter</u>, 423 F.3d 363, 371 (3d Cir. 2005) (internal citations omitted).[2]

---

[2] For purposes of this opinion, this Court focuses on the consent exception, rather than any subsequent acquiescence. This Court further notes that, per the Hague Convention, courts may also refuse to return a child if "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague

Under the consent exception, the burden is on the respondent to prove by a preponderance of the evidence that the petitioner consented to the removal. Id. at 368. As the First Circuit has observed, consent is "an inquiry that focuses on [petitioner]'s intent prior to the child's retention," and which "may be evinced by the petitioner's statements or conduct, which can be rather informal." Nicolson, 605 F.3d at 105. Or, as the Third Circuit put it, "[i]n examining a consent defense, it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country. The nature and scope of the petitioner's consent, and any conditions or limitations, should be taken into account." Baxter, 423 F.3d at 371.

## B. Moura v. Cunha

In this case, there was no discussion as to the threshold inquiry. The parties agreed both that Luana's habitual residence was Brazil and that her retention was illegal after the authorization to travel expired in October 2012. See Tr., Dec. 12, 2013, 3:20-5:1. Therefore, the threshold inquiry was met by Moura, and the presumption of return applied. It was Cunha's burden then to demonstrate that one of the exceptions

---

Convention art. 13. This exception, however, does not come into play in the present cases.

should apply, thus preventing Luana's return to Brazil.  Id. at
5:2-6.

During trial, Cunha asserted a mix of two exceptions.  More
precisely, while the core of Cunha's contention seemed to be
that the return to Brazil would place Luana in grave risk, Cunha
also attempted to establish that Luana was well-settled in the
United States.  See id. at 5:25-7:17.

According to Cunha, Luana's older siblings were aggressive
towards her, often screaming at her.  Id. at 20:7-14.  Cunha
also testified that Luana's development in Brazil was hindered
by the complete lack of care by those surrounding her.  Cunha
affirmed that she witnessed Luana not being properly fed, and
that she saw that Moura's refrigerator was frequently empty
because Moura did not have money to buy food – or even water.
Id. at 20:15-21.  Finally, Cunha clarified that Luana was
receiving psychological support and was enrolled in an
individualized education program.  Id. at 22:11-24:8.  Cunha
mentioned that Luana was well-settled in this country, getting
along well with the people surrounding her.  See id. at 19:15-
18.

Even assuming that Cunha's rendition of the facts is
precise and truthful, they are not sufficient to overcome the
presumption of return.  As explained above, the grave risk
exception demands clear and convincing evidence.  The fact that

Luana's siblings were aggressive toward her is unfortunate, but it does not lead to a conclusion of grave risk.  As expressed by Cunha, the aggression shown Luana by her brothers strikes the Court as more akin to typical sibling disputes than to something more deeply troubling that might counsel more strongly in favor of return.

Regarding the health risk, there was not enough evidence that Luana's return to Brazil would endanger her.  As the Second Circuit explained in Blondin, the fact that the return might cause hardship or even eliminate certain educational or economic opportunities do not constitute a grave risk of harm under the Hague Convention.

As to the well-settled exception, this Court acknowledges that the first prong of the exception no doubt applied in this case.  The petition was filed on November 8, 2013, Moura's Pet., more than one year after October 20, 2012, when Cunha's authorization to travel with Luana had expired, id. ¶ 8.  Cunha failed, however, on the exception's second prong, by not proving that Luana was well-settled in the United States within the meaning of the Convention.  As explained above, nothing less than substantial evidence of the child's significant connections to the new country will suffice to meet the respondent's burden of proof.  Here, there was no evidence whatsoever regarding Luana's social networks and relationships.  In such

circumstances, the Court could not find that Luana was well-settled here.

In the end, although it was undeniable that Cunha took good care of Luana, and it is also very likely that Luana had a more comfortable life here than she will have in Brazil, these facts are not sufficient to meet the aforementioned exceptions. Accordingly, Luana was ordered returned to her mother in Brazil. Electr. Clerk's Notes, Dec. 12, 2013, ECF No. 18.

### C.   **Gallagher v. Gallagher**

This case requires a more nuanced analysis of the relevant facts, as many of them are disputed.  Most critically, the parties disagreed as to whether there was consent for the children to remain in the United States.

In her initial answer, Mary denied that the family's country of habitual residence was Ireland, claiming that "the parties lived together in the United States for periods of time and further that [Brendan] while in the United States consulted Massachusetts legal counsel specializing in immigration issues for purposes of being able to live in the United States. [Brendan] further possesses a United States driver's license and social security number."  Mary's Answer ¶ 8.  During trial, however, Mary all but conceded that Ireland was the country of habitual residence, focusing instead in the argument that the children's retention in the United States was not illegal

because Brendan consented to it.  Gallagher v. Gallagher Judge's
Findings ("Gallagher Tr.") 13:12-13, 14:13-15.[3]

According to Mary, she and the children came to this
country "with the written blessing and consent of [Brendan]
including a job recommendation."  Mary's Answer ¶ 5.  She
contended that, rather than coming to the United States on
vacation, she and the children came to Massachusetts so that she
could find work and ultimately settle here.  Id. ¶ 10.  In this
context, Mary explained that she only purchased round-trip
tickets for herself and the children because of the possibility
that she would not find work.  Id.  Mary also affirmed that in
July she informed Brendan she had found a good job and would not
be returning to Ireland; afterwards, at his request, she sought
advice on obtaining a visa for Brendan.  Id. ¶ 17.  She further
claimed that Brendan "had a change of heart once he understood
that he would have to start the visa process over again . . .
[and] changed his mind about the parties living in the United
States."  Id. ¶ 19.

Brendan claimed throughout the case that he never consented
to the children being retained in the United States, and that
the trip to this country was intended to be a vacation, with the
family's return to Ireland set by the round-trip tickets.

---

[3] This source is a transcript of the findings this Court
entered at the close of the trial in this case.  It does not
appear on the docket.

Brendan's Pet. ¶ 15.  The Court had to decide whether Brendan consented to the children's retention in the United States.

At the end of the trial, the Court made its findings of fact.  The Court here summarizes these facts.[4]  Mary and Brendan's relationship soured around 2009, coinciding with the economic crisis in Ireland.  Gallagher Tr. 3:10-15.  At that time, the family came to the United States with the intent of starting a life here.  Id.  Although Brendan found sporadic work, he and Mary returned to Ireland in December 2009 after deciding that this work was not sufficient to support the family.  Id. at 3:16-24.  The relationship between Mary and Brendan worsened over time and, "[b]y February of 2012, the two were no longer intimate and lived in separate parts of the" family's house.  Id. at 5:8-11.  By then, "Mary had contacted the legal services agencies in Ireland . . . to seek advice potentially for bringing the marital relationship to an end.  Because of long waiting periods she was unable to get an appointment, but the agency sent a letter to the home, which greatly upset Brendan, and . . . there was a 'row' between the two."  Id. at 5:11-18.  The Court found that "the two shouted at each other," but did not find there was "physical violence on Brendan's part against Mary."  Id. at 5:19-21.  The Court also

_____

[4] The Court omits from the present memorandum a significant portion of the facts found; this does not mean, however, that such facts were not relevant to the outcome of the present case.

found that, as a result of the "row," Mary became frightened of Brendan.  Id. at 6:13-15.  Moreover, the Court acknowledged the "profound effect" the altercation had upon Mary, who at that time "concluded that the relationship between she and Brendan could not be repaired and in essence was at an end, both physically and emotionally."  Id. at 7:5-12.

The Court further found that, at some point after the "row," Mary made an entry in her journal setting forth her goal of getting divorced and moving with the children in May or June (though the Court did not explicitly note which year Mary was referring to) to the United States, whereupon she planned to remarry "Steve."[5]  Id. at 7:24-8:3.  In order to accomplish that plan, Mary "broached the goal of visiting her sister," who lives in Massachusetts, to see her newborn baby.  Id. at 8:10-12. What is beyond dispute at this point is that Mary and Brendan discussed her coming to the United States at least for a visit. Although Mary testified that she made it clear to Brendan that she was moving to the United States, the Court did not so find – the Court did find, however, that "to any objective observer it would have been clear that she thought that the marital

---

[5] The Court concludes that "Steve" is a reference to Stephen Florentine, the father of Mary's oldest child – Devon, not a subject of the present case – and with whom Mary had had "more frequent communication" since 2011.  Gallagher Tr. 4:21-5:2. The Court, however, did not "infer any untoward relationship between [Mary and Stephen]."  Id. at 5:3-4.

relationship was at an end." Id. at 8:15-18.  Brendan had other

plans, and not only wanted the relationship to continue, but

also wanted "to have his children in close proximity to

himself." Id. at 8:19-22.  Brendan agreed, however, to execute

a document drafted by Mary, with the purpose of allowing her to

seek emergency medical care for the children while in the United

States.  Id. at 8:22-9:1.  This document says the

authorization's scope is "traveling/moving to United States of

America." Id. at 9:3.  At the same time, Mary acquired round-

trip airline tickets, with the return set for August 19, 2013.

Id. at 9:14-16.  At this point, the Court noted:

> I do find that Mary explained to Brendan that she was
> going to actively look for work in the United States
> and I find . . . that Brendan provided her a letter of
> recommendation . . . .
>
> I thus infer that Brendan in fact – indeed any
> reasonable person would have understood that she was
> going to the United States, perhaps on a visit, but if
> she had obtained work it was her intention to stay
> there.  I further find that his desire to be close to
> his children led him to ask Mary to see about . . .
> his immigration status so that he could return to the
> United States.  He had, in these earlier years, been
> in possession of a green card, but so much time had
> passed since last he was in the United States that it
> had lapsed.  And I find that they had agreed that she
> would go to the Irish Pastoral Center in Boston to see
> if they couldn't get advice about her, as she was an
> American citizen sponsoring him in the United States.
>
> I don't credit her testimony that she made it clear
> that she was never coming back, that there was no hope
> for them to reconcile.  I do find that . . . Brendan
> agreed to their travel to the United States for a
> visit and that he, fearing that she might not come
> back, was prepared to move to the United States.

> She and the children left for the United States on May
> 19th. . . . Within a week, by May 28th, Mary had
> enrolled the school-aged children in schools on the
> Cape and had indicated that only she was to have any
> notice of that school enrollment and other school
> matters, in other words she excluded Brendan from
> knowing that [the children] had been enrolled.

Id. at 9:16-11:3.  The Court also found that by July 11 Mary had

found work as an administrative assistant and that her salary,

together with social welfare money, would suffice for the

maintenance of the children and herself.  Id. at 11:4-8.  On

that same day, Mary met with an attorney named Harrington whom

she found through the Irish Pastoral Center.  After Mary

explained to him that she and Brendan were deeply estranged, the

attorney "advised her that it would not make sense for her to

seek to sponsor [Brendan] on a visa, as they were not a marital

unit, [and] were not in any way planning to live together."  Id.

at 11:13-24.  Afterwards, Mary informed Brendan that she was

going to stay in the United States with the children, which led

him to become "extremely upset."  Id. at 11:25-12:4.  Finally,

the Court found – noting that this was "one of the more poignant

things here" – that Brendan "went to the airport hoping against

hope that the children would return on the August 19 flight, but

they did not."  Id. at 12:9-13.

Upon this set of facts, the Court concluded that the

children's habitual residence was Ireland and that the children

were not wrongfully removed, because "Brendan gave consent to

their travel to the United States for the purpose of this visit
. . . up to August 19th." Id. at 13:9-18. The Court observed,
however, that "the inquiry does not end there," and went on to
analyze whether the children were "wrongfully retained in the
United States." Id. at 13:18-19. Relying on the First
Circuit's decision in Nicolson, and also on case law from other
Circuits, the Court concluded that Mary did not meet her burden
of proving Brendan's consent, and that accordingly the
children's retention was wrongful. Id. at 15:11-16.

As mentioned above, the First Circuit has observed that
consent is a fact-intensive inquiry "that focuses on [the
petitioner]'s intent prior to the child's retention," and which
"may be evinced by the petitioner's statements or conduct, which
can be rather informal." Nicolson, 605 F.3d at 105. In
Nicolson, the child's habitual residence was Australia, and her
American mother removed the child to the United States after her
marriage to the child's Australian father had collapsed. In
that case, during pregnancy the mother had allegedly informed
the father that "she wanted to move back to the United States"
as soon as the child was born and they were both cleared to
travel. Id. at 101. As to the key consent inquiry, there was a
factual dispute. As the First Circuit put it, "[the father] and
[the mother] arranged for a U.S. passport for [the child] — [the
father] says merely so [the child] could visit [the mother]'s

family in the United States, but [the mother] says [the father]

knew of and reluctantly acceded to her plans to move herself and

[the child] permanently to the United States." Id. at 102.  The

First Circuit went on to analyze the evidence in the case:

> [The mother] points to several facts already mentioned
> – [the father]'s participation in extensive
> preparations for her and [the child]'s trip and the
> transfer of the car's title — and to others: [the
> father]'s invitation to a male friend to move into the
> house after his family's departure, [the father]'s
> mother's e-mails expressing sadness at losing the
> child, [the father]'s Internet posts on Facebook.com
> that described [the child]'s departure as "my loss of
> my family" and "his baby girl ha[ving] been ripped
> from him" and his change of status on that website
> from "married" to "single" (which he quickly changed
> back), and various other statements.
>
> But [the father] can also point to circumstances in
> his favor consistent with his testimony that he
> believed [the mother] and [the child] would return to
> Australia and did not consent to more than a temporary
> stay for [the child] in the United States.  These
> include his immediate arrangement for leave to fly to
> Sydney to confront [the mother] and seek legal advice
> after his mother informed him of [the mother]'s
> intentions, [the mother]'s statements that she was
> open to continuing to work on their marriage, his
> efforts to persuade her to return thereafter and her
> reservation of a ticket to return.

Id. at 106 (eighth alteration in the original) (footnote

omitted).  The Court concluded that the father did not consent

to the removal, observing that "[n]owhere is it claimed that

[the father] expressly agreed that the child could move

permanently to the United States.  His behavior is at least as

consistent with that of a man who wanted to continue the

marriage and, therefore, to avoid forcing a final choice on his wife." Id. Interestingly enough, however, the court also mentioned that, "[i]f the district court had found consent, it might not have been easy to find this clear error or an unreasonable assessment; but, in finding that [the mother] has not carried her burden to show consent to a permanent relocation of the child, the finding is no less protected against reversal." Id.

The Third Circuit reached a similar conclusion in Baxter. After noting "it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country," Baxter, 423 F.3d at 371, the court went on to analyze the set of facts found in the case and ruled there was no consent:

> [I]t is clear that [the father] consented to [the child]'s visit to Delaware for a limited period of time, under certain circumstances and conditions. But nothing in the record demonstrates that he consented to the child's permanent retention in the United States, or to [the mother] making unilateral decisions regarding [the child]'s future. Nor is there evidence that [the father] acquiesced to the present arrangement. Record testimony from both parties supports [the father]'s contention that his consent was limited and conditional. Both parties testified the marriage was intact when [the mother] and [the child] left Australia, and that the plan was for [the father] to rejoin them in Delaware for a visit at Christmas. Both parties testified they contemplated the possibility of relocating to the United States together as a family at some point, depending on [the father]'s job prospects and other factors, but agree that no firm plan was in place as of September 2003. Since learning

of [the mother]'s decision to retain [the child] in . .
. Delaware and raise him with [a new boyfriend], [the
father] has vigorously objected and pursued his rights
under the Convention.  In sum, the record demonstrates
that [the father] agreed to [the child] staying at his
grandmother's house in Delaware for a few months while
the family figured out its next move, but it is unclear
that he agreed to anything beyond that.  This intent
falls short of the standard for finding consent under
article 13(a) of the Convention.

Id. at 372.

This Court also considered a case from the Ninth Circuit

where the court ruled there was consent.  Gonzalez-Caballero v.

Mena, 251 F.3d 789 (9th Cir. 2001).  There, the child was born

in Panama to a Panamanian mother and an American father who was

then stationed in Panama.  Id. at 790-91.  After the father went

back to the United States, the child remained with the mother in

Panama.  At some point, however, the mother called the child's

father and told him she could no longer adequately care for the

child.  Id. at 791.  The father then went to Panama to meet with

the mother and to bring the child back to the United States.

Id.  There was some dispute as to the specific circumstances and

terms of the agreement between the parents.  See id. at 791-792.

The Ninth Circuit, however, affirmed the district court's

conclusion that the mother consented to the removal and

retention of the child in the United States, noting that:

    The district court undertook a careful parsing of the
    evidence to support [the consent] conclusion.  First,
    there was no evidence that [the mother] objected to
    [the child] becoming an American citizen.  Second, [the

father]'s testimony that [the mother] told him that she
had a problem - that she was pregnant and her boyfriend
had left her - was believable.  Third, none of the
witnesses other than [the mother] (including [the
mother]'s own mother and sister) testified that they
knew anything about [the child]'s visit being
temporary.  Fourth, it made no sense for [the father]
to use his travel advance to come to Panama to get [the
child] for just a short visit.  Fifth, [the mother]
provided [the father] with all of [the child]'s
paperwork, not just the paperwork necessary for her to
travel to the United States for a brief visit, and
assisted [the father] in procuring exit papers for [the
child] from the Panamanian authorities.  Sixth, [the
mother]'s testimony about "regretting" her decision to
let [the father] take [the child] immediately after
their departure and visiting the authorities so soon
after their departure makes no sense if [the child] was
to have been gone only briefly and [the father]'s lone
transgression was neglecting to telephone her upon
their arrival in the United States.  Seventh, [the
mother]'s mother testified that [the mother] told her
that she regretted turning over custody . . . .
Finally, [the father]'s intervention to keep [the
mother] in the United States shows that he did not fear
her visit, as he likely would have if he was wrongfully
retaining [the child].

Id. at 793.

Turning back to the present case, this Court concluded that
it fell closer to the disputes where consent was not present –
such as the First Circuit precedent in Nicolson.  The Court
found particularly compelling the notion that Brendan may have
consented to the children moving to the United States so long as
he would also be able to join them.  It ultimately became clear,
however, that his joining the family would not be possible,
especially considering that Mary would not sponsor a visa for
him because their marriage had fallen apart.  As a result, and

taking into consideration that Brendan's consent was limited to that specific set of circumstances (i.e. his being able to join the children in the United States), the Court concluded that Mary had not carried her burden of proof for the consent exception. As the Court expressed during trial:

> The most difficult issue in this case and the issue on which the case turns is the extent of Brendan's consent because consent, as the cases make clear, is a joint consent. What we have here is the sad situation of one parent, married, intending one thing, um, not committing fraud, not saying she would do one thing and then do another, but not being completely candid that their joint relationship was over and she was headed for the United States with the children and . . . Brendan, who still clung to some hopes for the relationship and made clear throughout . . . his wish to be with his children in Ireland preferably, but in the United States if he could not be with them in Ireland. And so that presents the most difficult issue.

> He consented to their visiting in the United States. His consent went so far as their remaining in the United States if he could be in the United States with them. But I do not find, by a fair preponderance of the evidence, that he ever consented to the situation that had arisen, that the children are here in the United States, but given the immigration laws of the United States, he cannot be here with them.

Gallagher Tr. 14:13-15:10. This conclusion is in tune with Baxter's conclusion that the nature and scope of the petitioner's consent, and any conditions or limitations, should be taken into account. Accordingly, the Court ruled that "it is for the courts of Ireland to determine the appropriate custody of the children and the children must be returned to Ireland so

that those determinations properly can be made." <u>Id.</u> at 15:17-20.

## IV. CONCLUSION

For the foregoing reasons, this Court granted the relief requested by the petitioners in both cases, and ordered the return of Luana to Brazil and of the Gallaghers' children to Ireland.

_/s/ William G. Young_
WILLIAM G. YOUNG
DISTRICT JUDGE